UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:20-cr-00053-MMD-WGC |
| Plaintiff, | ORDER |
| v. | |
| JEFFREY LOFSTEAD, | |
| Defendant. | |

## I.  SUMMARY

Defendant Jeffrey Lofstead was indicted on one count of attempted sex trafficking of children in violation of 18 U.S.C. §§ 1591(a), 1591(b)(2), and 1594(a). (ECF No. 1.) Lofstead now moves to dismiss the indictment, arguing the underlying investigation violated fundamental notions of fairness and his Fifth Amendment right to due process. (ECF No. 21.) Lofstead also moves to suppress the results of the search of his cell phone, arguing the search was performed pursuant to an impermissibly broad warrant. (ECF No. 22.) The Court heard argument on both motions on October 15, 2021 ("the Hearing"). (ECF No. 41.) As explained further below, the Court will grant the motion to suppress because the warrant was fatally overbroad and lacked particularity. However, because the Court finds the government's reverse sting operation violated fundamental fairness, the Court will dismiss the indictment.

## II.  FACTUAL BACKGROUND

### A.  The Task Force and Operation

In October 2020, the FBI's Northern Nevada Child Exploitation and Human Trafficking Task Force ("Task Force") initiated a reverse-sting operation ("Operation") targeting individuals seeking to purchase commercial sex from minors. (ECF No. 21 at 3.) The Operation's stated purpose is to "directly address the intentional purchase of sex

from minors utilizing common escort websites." (ECF No. 40-1 at 2.) Per the operational plan, the "driving legal authority" was Nevada statute found at NRS § 201.354(1)-(2), which the operational plan describes as criminalizing "solicitation of a child."[1] (*Id.*) Although Nevada does not criminalize general consensual sex between parties who are both over 16,[2] commercial sex is restricted to those over 18.[3] In other words, a 63-year-old man could engage in sexual activity with a 16-year-old girl without criminal penalty under Nevada law, but would commit a class B felony if he solicits commercial sex from that same girl or engages in non-commercial sexual activity with anyone younger than 16. The Operation targeted the latter offense.

Task Force agents posted an advertisement on the website www.skipthegames.com, which is known to law enforcement as a place where commercial sex is solicited and arranged. (ECF Nos. 21 at 3, 40-1 at 2.) Per the operational plan, the advertisements were placed "prior to the operation" and detectives had "established a client base." (ECF No. 40-1 at 2.) The Task Force's advertisement stated it was posted by "Emma," a 19-year-old "young busty brunette." (ECF No. 21-1 at 2-4.) Four pictures of a 23-year-old woman depicted "Emma" to users. (ECF No. 21 at 4.) A phone number was available for prospective clients to text, which was operated by an undercover detective. (ECF Nos. 21-1 at 3, 29 at 3.)

///

---

[1]This statute criminalizes solicitation outside a licensed house of prostitution from a peace officer (or a person assisting a peace officer) who is posing as a child. However, Nevada law does criminalize solicitation of children under 18 years of age per its sex trafficking statutes. *See* NRS §§ 201.300-301.

[2]"'Statutory sexual seduction' means ordinary sexual intercourse, anal intercourse or sexual penetration committed by a person 18 years of age or older with a person who is 14 or 15 years of age and who is at least 4 years younger than the perpetrator." *See* NRS § 200.364. Statutory sexual seduction is a class B felony, carrying a penalty of imprisonment for a term not less than one year and not more than ten years, with a possible fine of not more than $10,000. *See* NRS § 200.368(1).

[3]*See* NRS § 201.295 ("'Child' means a person less than 18 years of age."); NRS § 201.300(2)(a)(1) (criminalizing paying for sex with a child); *see also* NRS § 201.354(2) (criminalizing solicitation of sex outside a licensed house of prostitution from a peace officer posing as a child).

1   In total, the operation resulted in 28 arrests within a four-day period. (ECF Nos. 21

2   at 8, 29 at 15.)

3   **B.     Lofstead's Involvement**

4   Lofstead responded to the "Emma" advertisement on Skip the Games by calling

5   the listed number at 7:24 p.m. on October 7, 2020. (ECF No. 21-2 at 2.) When "Emma"

6   did not pick up, he texted "Hey." (*Id.*) A Task Force agent responded, and Lofstead then

7   texted and talked on the phone with the agent intermittently for around three and a half

8   hours. (*Id.* at 2-4.) After saying hello, Lofstead asked how much "Emma" charged and

9   whether she had "incall," a term commonly used in commercial sex work that means the

10  provider has a location to meet with clients. (ECF No. 29 at 3.) Law enforcement noted

11  that Lofstead appeared to be familiar with commonly used commercial sex terms,

12  including slang for hourly rates and oral sex. (*Id.*)

13  When the agent responded that she had a house in South Reno, Lofstead asked

14  "If your [sic] in a house, aren't there roomates [sic]." (ECF No. 21-2 at 2.) The agent

15  responded "no my parents are out of town rn." (*Id.*) Less than a minute later Lofstead

16  asked the agent "how old are you really," clarifying "I don't want 15," asking for

17  confirmation that the person he was texting was at least 16. (*Id.*) The agent said "Emma"

18  was 16. (*Id.*) After receiving that reassurance, Lofstead asked if she would be interested

19  in smoking marijuana, and if she would join him at his house "at the lake" instead of

20  meeting at her parents' house. (*Id.*) The agent responded that "Emma" would meet with

21  Lofstead if he would pick her up because she did not have a car. (*Id.*)

22  Lofstead again attempted to confirm "Emma"'s age, asking her to send a picture

23  of her ID "so I know your [sic] at least 16." (*Id.*) The agent responded that she did not

24  have an ID with her date of birth. (*Id.*) Lofstead also asked for a photo that was different

25  from the ones posted on the website, for a "kind of verification." (*Id.* at 3.) The agent sent

26  another photo. (*Id.*) After they had been texting for about an hour, the agent asked, "So u

27  coming or what?" (*Id.*) Lofstead responded, "To be honest I'm worried you may not be

28  16." (*Id.*) After the agent again assured him "Emma" was 16, Lofstead responded "Maybe

3

1  I'll come you can Get high and we can meet each other." (*Id.*) The agent rejected this

2  offer, texting "Not to be rude baby, but if ur coming I need the $$ for the time ya know."

3  (*Id.*)

4         After this exchange, Lofstead attempted to call the agent, but she did not pick up

5  and said that her "girlfriend" had come over. (*Id.*) Lofstead asked "Does she do this too,"

6  to which the agent responded yes, but said "she's under your limit tho." (*Id.*) Lofstead then

7  changed the subject back to the agent, asking her how long she had been "doing this"

8  and asking if she was aroused. (*Id.*) The agent affirmed, and reintroduced the subject of

9  her "under-limit" friend. (*Id.*) The agent and Lofstead then spoke on the phone, and

10  Lofstead responded that he "can't do that." (ECF No. 21 at 5.) When the agent responded

11  that it was only "a year difference," Lofstead said that in Nevada "that's a big thing." (*Id.*

12  at 6.)

13         Having clarified that Lofstead was not interested in paying for sex with "Emma"'s

14  15-year-old friend and that "Emma" was 16, Lofstead texted that he was getting ready to

15  leave at 9:46 p.m. (ECF No. 21-2 at 3.) The agent told him to "hurry." (*Id.*) Less than 15

16  minutes later, the agent asked "on ur way still?" (*Id.* at 4.) When Lofstead arrived at the

17  agreed upon location at approximately 10:45 p.m., he was arrested. (*Id.*; ECF No. 21 at

18  6.)

19      **C.**   **Warrant and Search**

20         Upon Lofstead's arrest on October 7, 2020, law enforcement seized his

21  smartphone. (ECF No. 22 at 2.) On November 3, 2020, FBI Special Agent Paul Cline

22  applied for a search warrant for the phone. (ECF No. 31-1.) Special Agent Cline stated in

23  the warrant affidavit that there was probable cause to believe the phone contained

24  evidence of or was used in the commission of: (1) the charged offenses, (2) attempting

25  to transport an individual under 18 with the intent to engage in criminal sexual activity,

26  and (3) attempting to travel over state lines with another person for the purpose of

27  engaging in illicit sexual conduct. (*Id.* at 4.)

28  ///

The attached list of items to be searched for and seized within the phone included, but was not limited to:

- Item 1: "Any and all records and materials that may be found within [the phone], in any format and media (including, but not limited to; images videos, e-mails, chat logs, text messages, instant messages and electronic messages), pertaining to the Target Offenses." (*Id.* at 13.)

- Item 2: "Any and all documents, records, or correspondence, in any format or medium (including but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) pertaining to the Target Offenses." (*Id.*)

- Item 3: "Evidence of any online storage, e-mail or other remote computer storage subscription to include unique software of such subscription, user logs or archived data that show connection to such service, and user login and passwords for such service." (*Id.*)

- Item 6: "Any and all material depicting or concerning the sexual exploitation of children, including but not limited to any child pornography . . . or any type of sexually explicit conduct involving children." (*Id.* at 14.)

The warrant affidavit did not include a temporal limitation on materials to be searched. It also authorized the FBI to "deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review." (*Id.* at 16.)

United States Magistrate Judge William G. Cobb issued the warrant on November 3, 2020 ("the Warrant"). (*Id.* at 2.)

## III.    MOTION TO SUPPRESS

Lofstead argues the results of the search of his smartphone must be suppressed because the warrant relies on unlawfully intercepted wire communications, is unsupported by probable cause, is overbroad, and lacks sufficient particularity. (ECF No. 22.) Because federal law allows any party to a conversation to record that conversation,

5

*see* 18 U.S.C. § 2511(2)(c),[4] the Court considers only whether the warrant was supported by probable cause and sufficiently specific.

Lofstead claims that evidence seized from his cell phone should be suppressed because the Warrant amounts to a general warrant, lacking any cognizable limitations and exceeding the government's demonstrated probable cause. (ECF No. 22.) The government concedes that the Warrant is in some ways overbroad,[5] but counters first that exclusion is not justified because the good faith exception applies, and in the alternative that only evidence obtained from an overbroad aspect of a warrant should be suppressed. (ECF No. 31.) As explained further below, the Court agrees that the Warrant is overbroad and lacks the requisite particularity. The Court examines first the appropriate standards for searches of electronically stored information ("ESI"), then turns to whether there was probable cause to search for the identified items in the Warrant. Because the Warrant authorized a search for evidence unsupported by probable cause, the Court considers whether the Warrant was overbroad or insufficiently particular. Finding the warrant is both, the Court then considers the government's good faith argument and the appropriate exclusion remedy.

## A.    Search Warrants for Electronically Stored Information ("ESI")

The Warrant Clause of the Fourth Amendment, which states "no Warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be seized," presents unique interpretative difficulties in the context of electronically stored information, or "ESI." As the Supreme Court noted in *Riley v. California*, "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." 573 U.S. 373, 393 (2014). But despite the fact that many electronic devices contain our most personal

---

[4]"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

[5]The government made certain concessions at the Hearing that were not in the briefing.

and private information, courts have expressly acknowledged that "'[o]ver-seizing' is an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.'" *United States v. Flores*, 802 F.3d 1028, 1044-45 (9th Cir. 2015) (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176-77 (9th Cir. 2010) (en banc) ("*CDT*")).

District courts nationwide have begun expressing concerns about over-searching ESI, especially because warrants often authorize the government to seize large quantities of personal information that it lacks probable cause to search.[6] Indeed, the Ninth Circuit has admonished courts "to exercise 'greater vigilance' in protecting against the danger that the process of identifying seizable electronic evidence could become a vehicle for the government to gain access to a larger pool of data that it has no probable cause to collect." *Schesso*, 730 F.3d at 1042 (quoting *CDT*, 621 F.3d at 1177)). Ensuring appropriate limitations within the warrant is therefore crucial to prevent a search "from turning into a general dragnet." *Flores*, 802 F.3d at 1045 (listing certain recognized limitations, including the requirement that a warrant "specify the particular crime for which the evidence is sought," rejecting retention of "unresponsive data" under the plain view doctrine, and finding suspect the use of over-seized data for "broader investigative purposes").

---

[6]*See, e.g.*, *United States v. Deschambault*, Case No. 2:19-cr-00187-JAW-1, 2020 WL 5637659, at *9 (D. Me. Sept. 21, 2020) ("[T]he over-seizure concern addresses the risk that in search electronic devices, the government will 'gain access to information it has no probable cause to collect.' But . . . this concern is not present where, as here, the government had probable cause to search for the evidence it seized.") (quoting *United States v. Comprehensive Drug Testing,* 621 F.3d 1162, 1177 (9th Cir. 2010)); *United States v. Harmon*, Case No. 3:18-cr-5786217, 2018 WL 5786217, at *1 (D. Or. Nov. 5, 2018) ("As technology changes and evolves, courts have sought to provide clarity on striking the right balance between individual privacy and law enforcement . . . The Ninth Circuit does not require that warrants for digital storage media specify a particular search protocol . . . but law enforcement officers are 'always limited by the longstanding principle that a duly issued warrant . . . may not be used to engage in a general exploratory search.'") (quoting *United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006)); *United States v. Hulscher*, Case No. 4:16-cr-40070-01-KES, 2017 WL 1294452, at *6 (D.S.D. Feb. 10, 2017) ("But because of the very breadth when the seizure of electronic data on the front end, police and courts know the seizure will in all reality contain a great deal—perhaps the overwhelming majority—of data which is nonresponsive to the reasons giving rise to probable cause for the search warrant in the first place.").

But how courts in the Ninth Circuit ensure that a warrant to search ESI complies with the Fourth Amendment is somewhat unclear and remains in flux. Indeed, the court has clarified that "the proper balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures of electronic data must be determined on a case-by-case basis." *Schesso*, 730 F.3d at 1050. Bearing this in mind, the Court considers whether the warrant was supported by probable cause and sufficiently particular to protect Lofstead's Fourth Amendment rights against unreasonable search and seizure.

### B.    Probable Cause

Lofstead argues the Warrant relies on two faulty premises for probable cause that impermissibly expanded the scope of the search of his phone. First, Lofstead claims the Warrant improperly conflated the sex trafficking charge with grounds to search for child pornography. (ECF No. 22 at 8.) Second, Lofstead claims that probable cause for a single incident of a crime does not justify an inference that multiple incidents have occurred. (*Id.* at 10; ECF No. 34 at 4.) Because the government only had probable cause to search for evidence of the attempted sex trafficking of "Emma," Lofstead argues that any search predicated on the inference that he serially solicited sex from minors was impermissibly broad.

"Probable cause is established if an affidavit presents a 'fair probability' that evidence of criminal activity will be found in the place to be searched." *Flores*, 802 F.3d at 1043 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When warrants are supported by probable cause and the search itself conforms with the terms of the warrant, the court has found suppression is not warranted. *See Schesso*, 730 F.3d at 1050-51. Great deference is given to an issuing judge's finding that a warrant is supported by probable cause, and the finding is reviewed for clear error. *See Flores*, 802 F.3d at 1043.

### 1.    Child Pornography

At the Hearing, the government conceded portions of the Warrant were likely overbroad. In particular, the government conceded there likely was not probable cause

to search Lofstead's phone for evidence of child pornography. The Court agrees. Not only was there no indication that Lofstead viewed, possessed, or shared child pornography in this or any other investigation, none of the target offenses in the indictment even involved child pornography. That Lofstead may have attempted to purchase commercial sex from a minor does not automatically imply that he possessed or attempted to possess child pornography, nor does the excerpted conversation from Lofstead's text conversation with the agent included in the warrant affidavit support a "fair possibility" that his phone would contain child pornography. Accordingly, Item 6 in Attachment B of the warrant affidavit is not supported by probable cause.

## 2.   Multiple Offenses

In response to Lofstead's contention that the Warrant lacked necessary content and temporal limitations, the government argued there was probable cause for a broader search because Lofstead's "clear experience with purchasing commercial sex and his stated preference for sex workers sixteen and older" gave law enforcement "every reason to investigate whether Lofstead had used the phone to purchase sex from minors in the past." (ECF No. 31 at 9.) Lofstead responded that evidence of one instance of criminal conduct does not provide probable cause of ongoing or serial criminal incidents. (ECF No. 34 at 4-5.) The Court agrees with Lofstead.

When considering probable cause, courts "cannot 'mechanically reason that some implies more.'" *United States v. King*, 985 F.3d 702, 709 (9th Cir. 2021) (quoting *United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990)). The Ninth Circuit has long recognized that the government's reasonable belief "that *some* incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same." *Weber*, 923 F.2d at 1344 (emphasis in original). This principle is illustrated by two contrasting Ninth Circuit opinions involving charges of felons in possession of firearms, *United States v. Nora*, 765 F.3d 1049 (9th Cir. 2014) and *United States v. King*, 985 F.3d 702 (9th Cir. 2021). In *Nora*, the court found that although the government had probable cause to search the defendant's home

9

"for the blue-steel semiautomatic handgun the officers saw him carrying," which was evidence supporting the crime for which they had probable cause to arrest the defendant, the officers did not articulate any "reasonable grounds to believe that any additional firearms would be found in the house." 765 F.3d at 1058. But in *King*, the court determined the government had shown there was probable cause to support a search for other firearms because the defendant had "received and concealed a firearm for another person" and that it was "fair to think that serving as an illicit depository of another person's firearm" made the defendant's possession of more firearms "likely." 985 F.3d at 709. The *King* court distinguished *Nora* based on the circumstances of the offense. *See id.* In *King*, the suspect in a domestic violence incident clearly felt the defendant would accept and conceal a firearm for another, despite knowing such possession was unlawful. *See id.* The court reasoned that this context justified a broader inference about the likelihood of the defendant having one or more firearms in his possession because other individuals knew him to be a person who would hide a firearm for them. *See id.* That context was lacking in *Nora*, where the officers knew only that the defendant had been convicted of being a felon in possession on prior occasions and had observed him with a single handgun. *See id.*

Although this distinction seems difficult to apply, what is clear is that a broader search is not justified "without more." *Id.* The facts of this case are more similar to those in *Nora*, in which law enforcement relied solely on their observation of a single crime to extrapolate that the defendant may have committed multiple similar crimes, than they are to those in *King*, where law enforcement relied on the behavior of third-parties in relation to the defendant to gain insight into the defendant's potential patterns of behavior. Moreover, the need for actual evidence as opposed to solely relying on inferences of continued or serial criminal conduct is even more pertinent in cases involving a search of ESI. *Nora* and *King* both involved searches of physical locations for discrete items which are not typically or necessarily subjected to over-seizure. The "greater vigilance" demanded in searches of ESI cautions against permitting inferences that aren't supported

1  by clearer facts. *See CDT*, 621 F.3d at 1177. The Court is not persuaded that indications

2  Lofstead may be familiar with the purchase of commercial sex, without more, is sufficient

3  to give law enforcement probable cause to search for prior instances of attempted sex

4  trafficking of children.

5        Accordingly, the Court rejects the government's argument that probable cause for

6  the single observed incident justifies probable cause to search for evidence of multiple

7  instances of similar conduct and concludes that probable cause existed only to search for

8  evidence of the attempted sex trafficking of "Emma."

9        **C.   Specificity**

10        Lofstead further argues that apart from whether the Warrant is supported by

11  probable cause, the Warrant amounts to a general warrant because it lacks clear

12  limitations on the items to be searched for and seized. (ECF No. 22 at 9-12.) The

13  government argues the Warrant was sufficiently specific under the circumstances. (ECF

14  No. 31 at 11-14.) As explained further below, the Court finds the Warrant is both

15  overbroad and insufficiently particular.

16        The Fourth Amendment requires that search warrants be specific. "Specificity has

17  two aspects: particularity and breadth. Particularity is the requirement that a warrant must

18  clearly state what is sought. Breadth deals with the requirement that the scope of the

19  warrant be limited by the probable cause on which the warrant is based." *United States*

20  *v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) (internal quotation marks and citations

21  omitted). The particularity requirement of the Fourth Amendment prohibits the

22  "exploratory rummaging in a person's belongings," *Andresen v. Maryland*, 427 U.S. 463,

23  480 (1976), a concern initially associated with general warrants. *See Perez Cruz v. Barr*,

24  926 F.3d 1128, 1140 (9th Cir. 2019) (noting that general warrants "motivated the framing

25  and adoption of the Fourth Amendment" (quoting *Payton v. New York*, 445 U.S. 573, 583

26  (1980))). Courts in the Ninth Circuit therefore consider three factors in determining

27  whether a warrant is impermissibly overbroad:

28            (1) whether probable cause existed to seize all items of a category
          described in the warrant; (2) whether the warrant set forth objective

1

2

3

standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available.

4

5

6

*United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *United States v. Lei Shi*, 525 F.3d 709, 731-32 (9th Cir. 2008)). Because Lofstead at times combines the particularity and breadth arguments, the Court will address them together.

7

8

9

10

11

12

13

14

15

16

17

18

19

Lofstead identifies four discrete issues with the Warrant: (1) the Warrant lacked any objective standards limiting search of content on the phone; (2) the Warrant lacked any temporal limitation; (3) the Warrant lacked a search protocol to filter relevant from irrelevant information; and (4) the only information the officers had probable cause to search for could have been much more clearly and particularly identified. (*Id.*) The government counters that the Warrant was reasonably particular under the circumstances and that ex ante search protocols are not required. (ECF No. 31 at 11-13.) As a preliminary matter, the Court agrees that the Ninth Circuit has rejected inclusion of protocol as a constitutional requirement. *See Schesso*, 730 F.3d at 1049 ("By its own terms, the concurring opinion [in *CDT*] proposes the protocols not as constitutional requirements but as 'guidance,' which, when followed, 'offers the government a safe harbor.'" (quoting *CDT*, 621 F.3d at 1178) (Kozinski, C.J., concurring)).[7] The Court will focus on Lofstead's other arguments.

20

### 1.   Temporal Limitation

21

22

23

24

25

26

First, the Court finds the absence of any temporal limitation does create an overbreadth issue because the Warrant authorized searches of vast amounts of information for which the government lacked probable cause. The Ninth Circuit has not definitely resolved whether a complete lack of temporal limitation on searches for ESI are facially overbroad. *See Flores*, 802 F.3d at 1045 ("Ultimately we need not decide whether the warrant was overbroad for lack of temporal limit because even if it was, suppression

27

28

―――――――――

[7]Unfortunately, this language appears to often be used to justify the lack of ex ante search protocols, even in circumstances when they would be useful and relatively easy to implement.

of the evidence used at trial was not required."). However, this Court has previously found a warrant with a temporal limitation that antedated the relevant crime period by only four days was impermissibly overbroad. *See United States v. Roberts*, 430 F. Supp. 3d 693, 717 (D. Nev. 2019); *see also United States v. Cariani*, Case No. 3:17-cr-00062-LRH-CBC, 2019 WL 5085418, at *6 (D. Nev. Oct. 10, 2019) (noting approvingly that a warrant was more narrowly tailored than that in *Flores* precisely because it contained a temporal limitation). In *Roberts*, the Court found searching the defendant's phone prior to the crime was not supported by probable cause because the stated basis in the affidavit for the search was triggered only after the crime had been committed. *See* 430 F. Supp. 3d at 717.

Temporal restrictions are not a de facto requirement, but courts that have allowed warrants without temporal limitations have reasoned the limitation would have served no limiting purpose. Another court in this circuit reasoned that a warrant which lacked temporal limitation was valid because the subject matter to be searched roughly aligned temporally with the period of relevant criminal activity for which the government had probable cause to search. *See United States v. Johnson*, Case No. 6:14-cr-00482-MC, 2018 WL 934606, at *2 (D. Or. Feb. 16, 2018) (finding a warrant authorized unbounded searches of social media accounts met the particularity requirements because the criminal activity preceded the account's creation). Practical concerns motivated another court, which found that a temporal restriction was not required because the account's creation itself was relevant to both the prosecution and defense. *See United States v. Sam*, Case No. CR19-0115-JCC, 2020 WL 2131285, at *3 (W.D. Wash. May 5, 2020) (finding a temporal limitation on the warrant would impede collection of pertinent evidence relating to who created the account).

But there is no justification for an unrestricted search without any temporal limitations here. To the contrary, this case illustrates how the complete absence of temporal limitations can result in an exceptionally expansive search. Like in *Roberts*, the government here had very precise knowledge of the date and times texts and internet

13

1   searches could be targeted because Lofstead had communicated directly with
2   undercover law enforcement agents. *See* 430 F. Supp. at 717. The government therefore
3   knew exactly when the phone was used to commit the target offense and could tailor—
4   and indeed should have tailored—the search, here even to a single day. As discussed
5   above, the government lacked probable cause to search for evidence of other incidents
6   of wrongdoing, so there was probable cause to search for text messages, internet search
7   history, ingoing and outgoing calls, and other data only in a very limited window of time.
8   But the Warrant did not reflect that limitation, or otherwise guide executing officers in their
9   search so that data could be targeted and tailored to the demonstrated probable cause.
10  The scope of the Warrant was therefore impermissibly overbroad.

11          **2.    Differentiation Between Items Included and Excluded from the**
12                  **Search**

13          The Court further finds that the descriptions of items to be searched for
14  insufficiently particular. Although the items listed in the Warrant are not exactly vague,
15  they are so numerous and unspecific to create an unrestricted "dragnet" search. *See*
16  *Flores*, 802 F.3d at 1045. Indeed, Item 1 authorizes the government to search for "[a]ny
17  and all records and materials that may be found within [the phone], in any format and
18  media (including, but not limited to; images videos, e-mails, chat logs, text messages,
19  instant messages and electronic messages), pertaining to the Target Offenses." (ECF
20  No. 31-1 at 13.) It is difficult to image what content on Lofstead's phone would be excluded
21  from the search—paired with the absence of a temporal restriction, Item 1 can reasonably
22  be read to authorize a search of all photos, all videos, all text messages, all emails, all
23  voicemails, all in-going and out-going calls, all internet search histories, and all social
24  media messages, potentially going back for years. Worse, the search is not even limited
25  to the phone itself: Item 3 authorizes a search for evidence of online or remote data
26  storage and the passwords to access those areas as well. (*Id.*) While the Court
27  understands that common practice requires over-seizure of ESI, this Warrant essentially
28  contemplates the right to search everything seized. Merely enumerating all potential

1   search areas does not satisfy particularity. The Court agrees with Lofstead that, as
2   written, the Warrant fails to delineate matters to be searched from those protected from
3   the search, authorizing instead "exploratory rummaging" through Lofstead's phone. *See*
4   *Andresen*, 427 U.S. at 480. The Warrant therefore lacked particularity.

### 3.   Reasonableness Under the Circumstances

6   Finally, the Court finds that the Warrant was unreasonably broad under the
7   circumstances, and the government could have provided a more targeted description of
8   items to be searched for and seized. As explained above, the government in this case
9   was in an unusually informed position to assess where evidence likely would be located
10  on the phone, and the information supplying probable cause was cabined to a single
11  evening. Moreover, there was over a month between Lofstead's arrest and the application
12  to search his phone. The circumstances were not emergent. There was sufficient time for
13  the government to establish whether a broader search was justified and to limit the
14  proposed search to more targeted areas. Still, the government's sole support for the
15  search as stated in the affidavit were the communications on October 7. The resulting
16  Warrant authorized what amounts to a general search of Lofstead's phone, largely
17  predicated on hopes of finding evidence there was not probable cause to collect.

### D.   Exclusion, Good Faith, and Severance

19  Having determined that the Warrant is overbroad and not wholly supported by
20  probable cause, the Court must consider the appropriate remedy. Lofstead argues that
21  total suppression is required. (ECF No. 22 at 12.) The government counters that the good
22  faith exception saves the Warrant from any breadth defect (ECF No. 31 at 16), and,
23  alternatively, that the Court should apply the severance doctrine to preserve the aspects
24  of the Warrant which are supported by probable cause (*id.* at 10). As explained below,
25  the Court finds the good faith exception does not apply. Moreover, the Warrant is
26  insufficiently particular to apply the severance doctrine. The Court therefore concludes
27  that the total suppression is required.

28  ///

### 1.      Legal Standard

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 141 (2009). Because the exclusionary rule serves "to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974), it "applies only where it 'result[s] in appreciable deterrence,'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Courts therefore do not view exclusion as "a necessary consequence," but rather "focus[] on the efficacy of the rule in deterring Fourth Amendment violations in the future." *See id.*

"Suppression of evidence seized pursuant to a warrant unsupported by probable cause is not appropriate if the government relied on the warrant in 'good faith.'" *United States v. Grant*, 682 F.3d 827, 836 (9th Cir. 2012) (quoting *Leon*, 468 U.S. at 923). "However, suppression 'remains an appropriate remedy' when a warrant is based on 'an affidavit so lacking in probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Leon*, 468 U.S. at 923). Courts have identified four general circumstances in which an officers' good faith reliance is *per se* unreasonable:

> (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citing *Leon*, 468 U.S. at 923-26). When invoking the good faith exception, "the government bears the burden of proving that officers relied on the search warrant 'in an objectively reasonable manner.'" *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 706 (9th Cir. 2009) (quoting *Crews*, 502 F.3d at 1136)).

16

"Partial suppression is proper under this circuit's doctrine of severance, which allows a court 'to strike from a warrant those portions that are invalid and preserve those portions that satisfy the fourth amendment.'" *United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) (quoting *United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984)).[8] "Total suppression, on the other hand, is appropriate when a warrant is wholly lacking in particularity." *Id.* "In general, we do not allow severance or partial suppression 'when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search.'" *SDI Future Health, Inc.*, 568 F.3d at 707. However, even when the valid portion of the warrant is smaller than the invalid portion, severance may be appropriate if it was "a principal portion" of the evidence the government sought. *Id.*

### 2.    Good Faith

Because the Warrant authorized a search that far exceeded the government's probable cause, the Court must determine whether the Warrant was executed in good faith reliance on its validity. Although the Warrant appears to have been executed according to its terms, the good faith exception does not apply because the Warrant's scope is *per se* unreasonable. *See Crews*, 502 F.3d at 1136. The defect arises not from a lack of compliance with the Warrant's terms, but from the failure of executing officers to recognize that the Warrant authorizes a general search of Lofstead's phone. Indeed, the officer who performed the full-file extraction of the phone, Robert Hight, confirms that he was "familiar [with] both the investigation and the search warrant." (ECF No. 31-3 at 2.) Hight compiled two reports, one full file of the contents of the phone, and one that contained material he had "tagged" as potentially relevant to this investigation for investigating agent Paul Cline's review. (*Id.* at 3.) Cline's review of the extraction reports, in which he "looked for activity related to the arrest of Lofstead as well as other evidence of Lofstead attempting to solicit other juveniles for the purposes of commercial sex act," complied with the essentially unlimited scope of the warrant. (ECF No. 31-2 at 2.)

---

[8]Every circuit has recognized the severance doctrine. *See United States v. Sells*, 463 F.3d 1148, 1150 n.1 (10th Cir. 2006) (collecting cases).

Neither Hight's investigation nor Cline's review conflicts with any terms of the Warrant because there is nothing in the Warrant that would limit their actions. There was no search protocol, no temporal limitation, and no discernable limits on content. As explained above, particularity is fatally lacking because an executing officer would not be able to distinguish material that is subject to search from that which is not. Hight states in his declaration that he decided what evidence in the full extraction was relevant based on his experience with the investigation, not based on any limitation in the Warrant itself. (ECF No. 31-3 at 2.) When faced with a warrant that authorizes an unrestricted search of almost all, if not explicitly all, content on a cell phone, an executing officer behaving in good faith should know that such a search is objectively unreasonable and would likely violate the defendant's Fourth Amendment rights. Instead, both Cline and Hight focused on trying to uncover previous incidents where Lofstead may have solicited minors, despite knowing that the only evidence supporting their probable cause to search was cabined to one three-hour interaction with Lofstead.

The search took place more than six years after the Supreme Court addressed the grave privacy concerns raised by cell phone searches in *Riley v. California. See* 573 U.S. 373, 393-97 (2014). The Court emphasized that cell phones contain "a digital record of nearly every aspect of their lives—from the mundane to the intimate," including everything ranging from financial statements to personal health concerns, data on the individual's physical location spanning years, their most private interests. *See id.* at 395. Although it is apparent that this investigation's purpose was to ferret out predators who take advantage of vulnerable individuals in our community, the privacy concerns associated with expansive searches of ESI are not unknown to officers, nor should they be so easily discarded. In an investigation such as this, where Task Force agents go looking for targets and make quick, efficient arrests, those concerns and the attendant risks should have been even more apparent. The Court cannot find that an executing officer who was familiar with the investigation could have executed such a broad warrant in objective good faith.

### 3.   Severance

Because the good faith exception does not apply, the Court must therefore determine whether the information supported by probable cause is severable from that which must be suppressed. To date, the government has not attempted to introduce any evidence obtained from Lofstead's phone that fell outside the scope of time period for which it had probable cause to search. Neither the indictment nor the government's briefs reference any incident other than that which occurred on October 7, 2020. The Court therefore concludes that, despite being a very small portion of the total content searched, the text messages and attendant data from the date of Lofstead's communication with the Task Force agent are the "principal portion" of evidence the government sought to obtain, and therefore severance may be considered. *See SDI Future Health, Inc.*, 568 F.3d at 707.

But Lofstead argues that severance is impossible because of way the Warrant is framed. (ECF No. 34 at 5.) Because every discrete category of areas to be searched is overbroad, Lofstead argues, the warrant lacks "identifiable portions" that are "sufficiently specific and particular to support severance." *See United States v. Spilotro*, 800 F.2d 959, 967 (9th Cir. 1986). The Court agrees that the portions of the Warrant which are supported by probable cause are not "textually severable" from those which are not. *See id.* at 968. This is a byproduct of the Warrant's probable cause defects: the conflation of the target offense with child pornography, and the expanded search for multiple incidents of the target events beyond just the October 7 incident. The breadth of the Warrant was justified by the twin assumptions that material would be hidden and could be found anywhere. It is therefore quite difficult if not impossible to extricate the material for which the government had probable cause to search from that which it did not, largely due to the government's own framing of the search and proffered justifications for its expanse.

///

///

///

19

1    The simple solution—and one the government appears to advocate—would be to

2    impose a post facto temporal limitation on the warrant suppressing all material prior to the

3    charged incident.[9] But to the Court's knowledge, this interpretation of the severance

4    doctrine has not been recognized. Moreover, severance to allow for the text

5    communications on October 7 as the government suggests (ECF No. 31 at 10-11) would

6    require an ex post facto remedy that serves no deterrence purpose given the Warrant's

7    expanse and lack of sufficient particularity. Indeed, the government's request for

8    severance as an alternate remedy contemplates that it would only be appropriate if

9    Lofstead could show that "a category of items to be seized that rendered the warrant

10   overbroad." (*Id.* at 10.)

11   Total suppression in this case would also serve the purposes of the exclusionary

12   rule in a way that severance would not. As explained in greater detail in the Court's

13   consideration of the motion to dismiss, the government's investigation itself was a fishing

14   expedition. That untargeted investigation in turn justified an untargeted search of

15   Lofstead's phone. The circumstances of this case do not indicate the overreach was due

16   to bad actions by a rogue officer, but rather a failure at each step to use restraint in

17   accordance with the protections of the Fourth Amendment when attempting to discover

18   and prosecute crimes on a broader basis. Searches of ESI likely to continue, and there

19   is every indication that people will continue to store vast quantities of incredibly important

20   and personal data on their cell phones. When law enforcement has information that would

21   enable more targeted searches, severance should not be used as a post facto remedy to

22   rewrite overbroad warrants. As law enforcement officers try to develop creative methods

23   to investigate and prosecute insidious crimes, they must do so while respecting

24   defendants' Fourth Amendment rights.

25

26   [9]Scholar Orin Kerr suggests that the way out of the double-bind of over-seizure and attendant searches without probable cause is for courts to bar the use of nonresponsive data revealed in executing a search warrant. *See Executing Warrants for*

27   *Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech. L. Rev. 1, 5 (Fall 2015). But while this remedy seems to provide a workable solution for

28   appropriately narrow warrants that incidentally over-seize and -search ESI, use-restrictions do not cleanly map onto warrants that are themselves overbroad.

1    The Court will therefore grant Lofstead's motion to suppress.

2    **IV.    MOTION TO DISMISS**

3    Lofstead also argues that the operation itself violated his Fifth Amendment due

4    process rights, and therefore moves to dismiss the indictment. (ECF No. 21.) The

5    government responds Lofstead has failed to meet the "extremely high standard" to show

6    dismissal on the grounds of outrageous government conduct is warranted. (ECF No. 29

7    at 5 (quoting *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013)). Although it is a

8    close call, the Court ultimately concludes that the circumstances of the investigation

9    warrant dismissal.

10   **A.    Outrageous or Fundamentally Unfair Government Conduct**

11   When law enforcement officers' actions are "so outrageous that due process

12   principles would absolutely bar the government from invoking judicial processes to obtain

13   a conviction," courts must dismiss the indictment. *United States v. Russell*, 411 U.S. 423,

14   431-32 (1973). This remedy is "limited to extreme cases" in which government conduct

15   "violates fundamental fairness." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir.

16   2011). "It is outrageous for government agents to (1) engineer and direct a criminal

17   enterprise from start to finish; (2) to use excessive physical or mental coercion to convince

18   an individual to commit a crime; or (3) to generate new crimes merely for the sake of

19   pressing criminal charges." *United States v. Pincombe*, Case No. 2:14-cr-00178-JAD-

20   GWF, 2015 WL 8480079, at *5 (D. Nev. Nov. 3, 2015) (citing *United States v. Black*, 733

21   F.3d 294, 302 (9th Cir. 2013)); *see also United States v. Stenberg*, 803 F.2d 422, 429

22   (9th Cir. 1986) ("Constitutionally unacceptable conduct includes, but is not limited to,

23   situations where law enforcement agents employed unwarranted physical or mental

24   coercion, where 'government agents engineer and direct the criminal enterprise from start

25   to finish,' and where the government essentially manufactures new crimes in order to

26   obtain the defendant's conviction.'") (internal citations omitted). Because "[t]here is no

27   bright line dictating when law enforcement conduct crosses the line between acceptable

28   and outrageous," each case turns "'on its own particular facts.'" *Black*, 733 F.3d at 302

1   (quoting *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), *vacated in part on*

2   *other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986)).

3       **B.**   **The *Black* Factors**

4       To help guide this circumstance-specific inquiry, courts in this circuit consider the

5   six factors set forth in *United States v. Black*, which include:

> (1) known criminal characteristics of the defendants;
> (2) individualized suspicion of the defendants;
> (3) the government's role in creating the crime of conviction;
> (4) the government's encouragement of the defendants to commit the offense conduct;
> (5) the nature of the government's participation in the offense conduct; and
> (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

11   733 F.3d at 303. The first three factors address the government's conduct when initiating

12   a sting, with factors four and five addressing the conduct of the government during the

13   operation. *See id.* at 304, 308. The final factor concerns the relationship between the type

14   of crime being investigated and whether the techniques used by the government were

15   necessary. *See id.* at 309. The parties agree there is no prescribed manner for weighing

16   the *Black* factors, but rather the facts of the case and surrounding circumstances must be

17   considered in their totality. *See id.* at 304 (noting the factors "do not constitute a formalistic

18   checklist," but rather help courts focus their analysis).

19       Although this case presents a close call, the Court finds the majority of the *Black*

20   factors weigh in favor of dismissal. At the time law enforcement initiated its reverse sting

21   operation, Task Force agents lacked any knowledge of Lofstead's character (including

22   his nonexistent criminal history) and had not formed an individualized suspicion of either

23   Lofstead or any identifiable group of which he was a part. Moreover, law enforcement

24   manufactured the entire crime from start to finish: first by creating the fictitious profile,

25   then altering the poster's age, and finally encouraging Lofstead to continue with an in-

26   person meeting after he showed hesitation. It is undisputed that the sale of commercial

27   sex with children is a serious, underreported, and difficult to detect offense. But in this

28   case, especially because Lofstead's liability arises out of an apparent mistake about the

22

1   legal age for engaging in commercial sex transactions, the Court finds the government's
2   behavior in orchestrating an untargeted, large-scale reverse-sting offends traditional
3   notions of fair play protected by the Fifth Amendment.

4   The Court explains its reasoning below, addressing first what law enforcement
5   knew about Lofstead prior to initiating the operation, then considering the government's
6   role in creating the crime and encouraging Lofstead to commit it, and finally weighing the
7   need for such tactics in prosecuting child sex trafficking.

8   **1.      Known Criminal Characteristics & Individualized Suspicion**

9   Courts often consider the first two *Black* factors together, as they are "closely
10  related." *United States v. Snagglers*, Case No. 2:14-cr-00086-JCM-PAL, 2015 WL
11  10436117, at *6 (D. Nev. Dec. 30, 2015). The first factor asks whether the government
12  knew the defendant had a criminal background or propensity "when it initiated its sting
13  operation." *Black*, 733 F.3d at 304. The second factor considers whether the government
14  had reason to connect the suspected individual (or group to which the individual
15  belonged) with the targeted offense under investigation. *See id.* Both factors tip sharply
16  in Lofstead's favor.

17  At the time the Task Force agents initiated their reverse sting, Lofstead was
18  entirely unknown to them. The agents lacked any knowledge of his characteristics,
19  propensities, or history, criminal or otherwise. The operation, by its nature, was
20  untargeted.[10] The government argues this factor is satisfied because law enforcement
21  agents formed an individualized suspicion after Lofstead responded to the advertisement.
22  (ECF No. 29 at 7.) The Court disagrees that later-developed suspicion, when unguided
23  by a previous suspicion of any cognizable group, is sufficiently individualized to satisfy
24  the first two *Black* factors.

25  Strictly speaking, law enforcement need not have individualized suspicion of a
26  defendant's wrongdoing before conducting an undercover investigation. *See United*

27  _____

28  [10]The operational plan states that "detectives have established a client base." (ECF No. 40-1.) However, it does not appear that Lofstead had any communication with agents prior to the night he was arrested.

*States v. Luttrell*, 923 F.2d 764 (9th Cir. 1991) (en banc) (vacating a three-judge panel's holding that "reasoned grounds" to investigate a particular individual was constitutionally required without providing any clarifying reasoning). However, whether law enforcement had reason to suspect "an individual or an identifiable group before initiating a sting operation is an important consideration." *Black*, 733 F.3d at 304. When a defendant was specifically known to law enforcement prior to the sting as a potential perpetrator of a particular criminal activity, courts are more likely to find that a sting operation did not constitute "outrageous" conduct. *See United States v. Pemberton*, 853 F.2d 730 (9th Cir. 1988) (finding no outrageous conduct where the government arranged for an undercover agent to meet with a target "who the government suspected to be a long-time drug dealer involved in a laundering operation"); *United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988) (finding no outrageous conduct where the FBI recruited an informant to contact the target company after forming a suspicion and opening an investigation for mail and wire fraud); *Stenberg*, 803 F.2d at 430 (noting the FBI agent met with the target "only after his investigation indicated they were already involved in continuing illegal transactions").

But even when law enforcement suspects a group of people, rather than an individual, the government's suspicion may be sufficiently individualized. *See, e.g.*, *United States v. Halgat*, Case No. 2:16-cr-00265-GMN-CWH, 2018 WL 8807134, at *10 (D. Nev. Dec. 26, 2018) (recognizing it was acceptable for law enforcement to launch an undercover investigation of a motorcycle organization to determine if it was engaged in criminal conduct which resulted in arrests over a year later). Indeed, the court in that case reasoned that the "salient" inquiry was whether the government had reason to suspect its targets "before initiating [its] sting operation," even if the investigation began earlier. *Id.* In *Halgat*, the undercover agent observed his targets purchase and use cocaine "on a number of occasions" over the course of a year before initiating the sting. *Id.* Concluding that the government had infiltrated a criminal organization that was "already engaged in or anticipating a criminal activity" before setting its sting operation in motion, the court

1  found law enforcement had developed individualized suspicion of both defendants. *Id.*

2  (quoting *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985).

3        However, when law enforcement does not suspect even an identifiable group of

4  people, the resulting tactics can be "troubling." *Black*, 733 F.3d at 302. In *Black*, law

5  enforcement agents used a confidential informant to "troll[] for targets" in "a bad part of

6  town." *Id.* at 303. The Ninth Circuit found not only that individualized suspicion was

7  lacking, but also that serious concerns of fairness and the government's abuse of power

8  were in play. *See id.* Because the agents had manufactured a cocaine stash house and

9  proposed a robbery with recruited defendants, the Ninth Circuit reasoned they risked

10 "creat[ing] a criminal enterprise that would not have come into being but for the temptation

11 of a big payday, a work of fiction spun out by government agents to persons vulnerable

12 to such a ploy who would not otherwise have thought of doing such a robbery." *Id.* Such

13 conduct serves no deterrent purpose, the court reasoned, as there is no indication a crime

14 would have been committed without the government's involvement—the targets had not

15 actively been seeking a robbery and the robbery target existed only through government

16 creation. *See id.*

17       The Task Force's actions in this case create just such a risk. The advertisement

18 was completely untargeted, directed broadly at men who may be seeking to purchase

19 commercial sex in the Northern Nevada area. Law enforcement had no reason to suspect

20 that Lofstead, or any individual for that matter, was interested in engaging in commercial

21 sex with a child. The Task Force agents had no knowledge about Lofstead's character

22 before he responded to the ad, at which time they could have learned that he had no prior

23 criminal history after obtaining his cell phone number. Even assuming the government

24 had a reason to suspect this specific website was prone to use by people who sought

25 commercial sex with children,[11] there is little to distinguish law enforcement's conduct

26 here from "trolling for targets" in a "bad" area. *See id.*

27 ─────────────────

28      [11]The government argues that Skip the Games has filled the void of Backpage, a
   website that was seized by federal authorities for its use by individuals seeking

25

Using a reverse sting instead of a traditional sting distinguishes this case from previous permissible operations in this District. In prior cases, an undercover agent operated a traditional sting by responding to an ad the defendant had posted that suggested an interest in sex with children. *See, e.g.*, *Snagglers*, 2015 WL 10436117 at *6-7 (finding no violation where law enforcement posed as an underage girl responding to an ad defendant had himself posted stating he was looking for "young girls"); *United States v. Pincombe*, Case No. Case No. 2:14-cr-00178-JAD-GWF, 2015 WL 8480079, at *6 (finding it was "reasonable" for an undercover detective to respond to an ad defendant posted seeking sexual encounters with "no limits and NO Taboos"). The court found law enforcement had reason to believe the target may be attempting to solicit sex from children based on the representations the targeted posters had themselves made. Here, law enforcement had no reason to suspect that Lofstead was attempting to solicit sex with a child, because they did not even know who he was until after the operation had begun. Agents were not responding to observed offensive behavior, as in *Snaggers* and *Pincombe*, but rather were working from a presumption that unknown targets were using Skip the Games for child sex trafficking.

That law enforcement could develop an individualized suspicion for the purposes of Lofstead after he texted the undercover agent is largely unpersuasive. The government argues that when agents "first encountered" Lofstead, he was attempting to commit a crime by soliciting a prostitute outside of a licensed house of prostitution. (ECF No. 29 at 7.) Lofstead also appeared familiar with the terminology of commercial sex and mentioned he had not seen "Emma" post before, suggesting to the agents that he had likely used Skip the Games to solicit commercial sex before. (*Id.*) But the first two *Black* factors are relevant to knowledge the government had "*before* initiating a sting." *See Black*, 733 F.3d at 304 (emphasis added). First, the government "encountered" him because they had already initiated the sting. Everything the government learned or suspected about

---

commercial sex with minors. But the government's only proffered evidence of this is the resulting arrests from the reverse-sting itself. (ECF No. 29 at 15.)

Lofstead happened after they had set the operation in motion. While the government attempts to distinguish these facts from the concerns the Ninth Circuit raised in *Black*, this is precisely the type of conduct that court found so worrying. *See id.* at 303. If law enforcement could demonstrate individualized suspicion merely by proposing crimes and waiting for someone to respond positively, then the government would have individualized suspicion of every person ultimately charged in a sting operation, and the factor would be meaningless.

But even assuming these factors could be satisfied by knowledge law enforcement obtained sometime between initiating the sting and proposing the targeted offense, the government fails to connect how Lofstead's suspected prior use of Skip the Games provided reasonable suspicion that he was interested in commercial sex with minors. While Lofstead's familiarity with commercial sex terminology and response to the ad clearly indicate he uses the website Skip the Games and supports the inference that he has attempted to solicit commercial sex in violation of Nevada law before, the Court strains to see how Lofstead's initial interactions with the undercover agent suggested he was trying to solicit sex from minors. There is no discussion of "Emma"'s age before the undercover agent begins to drop hints that she is still living with her parents. (ECF No. 21-2 at 2.) When the undercover agent suggests she is younger than her post indicated, Lofstead immediately shows hesitation and concern with complying with the law.[12] (*Id.* at 2-4.) The Court is not persuaded that Lofstead's conversation with the undercover agent provided reasonable suspicion that he was using Skip the Games to solicit sex from children before the agent indicated "Emma" was under 18.

///

---

[12]Of course, Lofstead was either mistaken or unaware that the age of consent is not the same as the age for permissible commercial sex. It is axiomatic that ignorance or mistake of law is not a defense. *See Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019). But the inquiry here focuses on the reasonableness, or unfairness, of the government's conduct, not whether Lofstead ultimately did or did not commit a crime. Although Lofstead's apparent confusion about the legality of his actions is not probative of his ultimate guilt, it is acutely relevant to whether law enforcement had a reasonable suspicion that he was actively trying to solicit commercial sex from minors and therefore a proper target of the operation.

The Court therefore finds the first two *Black* factors weigh in favor of dismissal. Additionally, the Court notes that the government's complete lack of individualized suspicion of Lofstead or even any definite group suspected of criminal activity, is analogous to the fact-pattern in *Black* and justifies a heightened concern when assessing the remaining factors.

### 2.    Government's Role in Creating the Crime, Encouraging the Defendant, and Participating in Conduct

The Court next considers the third, fourth, and fifth *Black* factors. As a preliminary matter, the Court is persuaded that the fifth factor—extent of government participation in the conduct—is not particularly useful in cases like these. The Court agrees with the government's point made at the Hearing that, by its nature, solicitation of commercial sex is likely to be private, and undercover agents posing as minors would necessarily be involved from start to finish. *See Black*, 733 F.3d at 308 (considering duration, nature, and necessity of participation in the offense). But the Court likewise appreciates Lofstead's argument that without the government's participation, this particular offense could not exist. Due to the nature of the crime and the requisite extensive involvement of law enforcement in policing it, the Court considers the fifth factor unhelpful in its overall analysis, and will consider instead the third and fourth—the government's role in creating the crime and encouraging the defendant to commit it. Due to the relatively truncated nature of the operation, which took place over a matter of days rather than years, the Court considers these two factors together as they frequently overlap.

Whether the crime, or something very similar to it, would have occurred without government involvement is of paramount importance to the fundamental fairness inquiry:

> Criminal sanction is not justified when the state manufactures crimes that would otherwise not occur. Punishing a defendant who commits a crime under such circumstances is not needed to deter misconduct; absent the government's involvement, no crime would have been committed . . . Where the police control and manufacture a victimless crime, it is difficult to see how anyone is actually harmed, and thus punishment ceases to be a response, but becomes an end in itself . . . Under such circumstances, the criminal justice system infringes upon personal liberty and violates due process.

1   *Bogart*, 783 F.2d at 1436. Relevant to the Court's inquiry is "whether the government

2   approached the defendant initially or the defendant approached a government agent, and

3   whether the government proposed the criminal enterprise or merely attached itself to one

4   that was already established and ongoing." *Black*, 733 F.3d at 305.

5        The parties dispute who approached whom. Lofstead argues the government

6   initiated the encounter by posting the advertisement and changing the poster's age from

7   19 to 16. (ECF No. 21 at 8.) The government counters that Lofstead approached the

8   undercover agent, who merely joined in ongoing criminal activity that Lofstead had

9   already proposed. (ECF No. 29 at 9.) This articulation of events is dubious at best. As in

10  *Black*, where the ATF set up a stash house and recruited defendants to plan a robbery,

11  the proposed encounter with "Emma" was "entirely [the government's] creation" and it

12  was the agent "who set the parameters for how it had to be carried out." *See Black*, 733

13  F.2d at 305. The profile was designed and posted by the government and the

14  conversation between the undercover agent and Lofstead proceeded according to a set

15  trajectory established by the operational plan. The "Emma" profile was intended to bait

16  potential purchasers of commercial sex into communicating with law enforcement, which

17  it successfully did. Moreover, the judges in this District have found in prior cases that

18  posting an advertisement online soliciting sex, not responding to one, initiates an

19  encounter. *See Snagglers*, 2015 WL 10436117 at *8 (finding that by posting a Craigslist

20  ad, defendant "was not responding to a scheme created by the government"); *Pincombe*,

21  2015 WL 8480079 at *7 (finding defendant "took the first step by soliciting sexual contact"

22  when he posted an online advertisement). The Court therefore declines to construe

23  Lofstead's response to the government's advertisement as "approaching" the

24  government.

25       Nor does the Court find that law enforcement attached itself to an ongoing criminal

26  enterprise. While the government argues law enforcement "merely investigated the scope

27  of the crime Lofstead had already demonstrated an interest in committing," the charged

28  offense differs in kind and orders of magnitude from that which Lofstead was apparently

attempting to commit initially. (ECF No. 29 at 9.) The government points out that Lofstead was already attempting to solicit commercial sex outside a licensed prostitution house, which is a misdemeanor under Nevada law. *See* NRS § 201.354(4)(a). But that is not the offense charged in the indictment, nor is it the stated target of the operation. It was law enforcement's decision to change the age of "Emma" from 19 to 16, materially altering the type of crime and bringing it within the operation's purview.

The government's ability to manipulate the situation in this way is of particular concern to courts, as the Ninth Circuit explained in the context of stash house robberies:

> In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that the proposed stash-house robbery was within the scope of [the target's] ambition and means.

*United States v. Briggs*, 623 F.3d 724, 729-30 (9th Cir. 2010). Here, the government's ability and willingness to alter "Emma"'s age after Lofstead responded to the text increased the sentence he was exposed to by twenty-fold, at a minimum. *Compare* NRS §§ 201.354(4)(a), 193.150 (carrying a *maximum* of six months in jail for solicitation outside a licensed house of prostitution) *with* 18 U.S.C. § 1591(b)(2) (carrying a *minimum* of ten years in prison, "or for life," for sex trafficking a child over 14 but under 18). Lofstead attempting to solicit sex outside a licensed house of prostitution is not equivalent with attempting to purchase sex from a child, and the Court declines to find that his actions created an "established and ongoing" enterprise to which the government "merely attached itself." *See Black*, 733 F.3d at 305.

The Court is likewise unpersuaded that the government's overwhelming involvement in creating the offense is of less concern because Lofstead appeared to be familiar with commercial sex and did not refuse to meet "Emma" after they began texting. (ECF No. 29 at 9-10.) In *Black*, the Ninth Circuit's concern about permitting the government to create a crime wholesale which baited an untargeted pool of people was

30

1    "mitigated" because the defendants told the undercover agent they had recently and
2    frequently engaged in similar criminal activity. 733 F.3d at 307. The court found it
3    particularly persuasive that after the informant set the bait, "the defendants 'responded
4    *without further inducement by the government.*'" *Id.* (emphasis in original) (quoting *United*
5    *States v. Bagnariol*, 665 F.2d 877, 882 (9th Cir. 1981)). Indeed, the defendants in *Black*
6    "eagerly jumped at the opportunity" the government presented. *Id.* at 308. But Lofstead
7    was immediately wary once the undercover agent began to hint "Emma" was not 19. He
8    repeatedly asked for confirmation of her age, including asking for a photo of "Emma"'s ID.
9    (ECF No. 21-2 at 3.) After Lofstead had been texting with the agent for about an hour,
10   they asked "so u coming or what??" to which Lofstead responded, "To be honest I'm
11   worried you may not be 16." (*Id.*) After the agent assured Lofstead "I am :)" but he was
12   reluctant and offered to get her high instead. (*Id.*) The agent responded, "Not to be rude
13   baby, but if ur coming I need the $$ for the time ya know." (*Id.*) Lofstead waited six
14   minutes, then responded that he did want to come. (*Id.*)

15       Although there is no evidence that the government coerced, threatened, or
16   otherwise acted "inappropriately," there is clearly evidence that the government
17   encouraged Lofstead to continue with the encounter despite his clear hesitation. Of
18   gravest concern to the Court are situations in which the government in some way coerced
19   or pressured the defendant into committing the target offense. *Black*, 733 F.3d at 308.
20   This case certainly does not involve the most concerning hypothetical government
21   conduct, but neither does it portray a defendant who is "eager" to commit the named
22   crime. *See id.* at 307. The government's argument that Lofstead could have simply
23   decided not to come at any time, though true, does not mitigate the fact that after he had
24   expressed reservations, the Task Force agent again pressed him to come, declined his
25   offer hang out with "Emma" without exchanging sex for money, and further attempted to
26   convince him to agree to pay for sex with a fictional 15-year-old girl. Despite that the
27   government's conduct is not the most severe it could have been, it certainly constitutes

28

1  encouragement to commit an offense that Lofstead was unaware he could be committing

2  when he responded to the "Emma" advertisement.

3  　　　Taken together, these factors weigh heavily in favor of dismissal. Absent the

4  government's involvement, this crime would not have taken place. The government

5  manufactured the scenario from start to finish. Despite that nothing about Lofstead's

6  actions indicated he was actively seeking commercial sex with someone under 18, the

7  government continued to manipulate the situation to attempt to persuade him to commit

8  a series of increasingly grave offenses.

9  　　　　　　**3.**　　　**Nature of the Crime Being Pursued and Necessity for Law**

10  　　　　　　　　　**Enforcement's Actions**

11  　　　The Court agrees with the government that the sale of commercial sex with

12  children is a "largely unreported crime" that is of "grave concern to the community." (ECF

13  No. 29 at 16.) The Court likewise does not question that modern child sex trafficking

14  frequently takes place online, including on websites like Skip the Games where a user

15  can post or respond to advertisements offering commercial sex. (*Id.* at 15.) Moreover, the

16  Court agrees with the government that this particular type of crime can be uniquely difficult

17  to police, whether because the victims are sometimes participants, are by nature very

18  young, or may come from groups that otherwise lack trust in law enforcement. Sting

19  operations may therefore be required to effectively uncover individuals who are seeking

20  to purchase sex from children.

21  　　　 But even when investigating serious crimes, the government is obligated to

22  proceed in a manner that conforms with fundamental fairness. Here, the operational plan

23  lacks any safeguards that would limit agents' actions when communicating with potential

24  targets or would ensure the focus the operation is policing child sex trafficking, rather than

25  broadly targeting anyone using a website for adult hookups. In fact, although the

26  directives in the operational plan are quite bare bones, they even state that the detectives

27  have "established a client base" at some time "prior to the operation"—a fact clearly

28  contradicted by Lofstead's experience. Instead, the entire encounter between Lofstead

and the Task Force agent appears to have taken place in a single evening. While more extreme tactics may be justified for policing an insidious crime like sex trafficking children, it is not at all apparent that they are warranted for cracking down on prostitution outside of a licensed house—the only crime that Lofstead apparently would have been committing by responding to the advertisement and entering the government's scheme.

Given the circumstances of this case, the Court finds that the scenario the government engineered so offended traditional notions of fairness that prosecution would violate Lofstead's Fifth Amendment due process rights. Accordingly, the Court will dismiss the indictment.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Lofstead's motion to suppress (ECF No. 22) is granted.

It is further ordered that Lofstead's motion to dismiss (ECF No. 21) is granted.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 22nd Day of November 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

33